Robin Tony ANGELINI, Petitioner–
Appellant,

v.

Roger D. COWAN, Respondent–
Appellee.

No. 01–1078.

United States Court of Appeals,
Seventh Circuit.

Submitted Aug. 17, 2001 *.

Decided Aug. 17, 2001.

---

* After an examination of the briefs and the record, we have concluded that oral argument is unnecessary. Thus, the appeal is submitted on the briefs and the record. *See* Federal Rule of Appellate Procedure 34(a)(2).

388

Before Hon. MANION, Hon. ILANA DIAMOND ROVNER, Hon. TERENCE T. EVANS, Circuit Judges.

## ORDER

Robin Tony Angelini was convicted in Illinois state court of sexually assaulting a woman in Quincy, Illinois, and sentenced to three consecutive terms of 60 years' imprisonment. After Angelini exhausted his state-court remedies, he sought a writ of habeas corpus from a federal district court, which denied his petition. Angelini argues on appeal that he is entitled to a new trial because his counsel was ineffective and because he did not voluntarily waive counsel at sentencing. We affirm in part, vacate in part, and remand for further proceedings.

In the early morning of May 20, 1996, a man broke into the victim's apartment, tied an electrical cord around her neck, threatened to kill her if she screamed, and penetrated her anally and vaginally with his finger. The attacker then dragged the victim into a bathroom and tightened the cord around her neck until she lost consciousness. The victim eventually regained consciousness, called 911, and remained in her bathroom until authorities arrived. The victim had marks around her neck from the cord and suffered a ruptured eardrum.

Quincy police investigators, aware that Angelini had pleaded guilty in 1982 to committing a brutal sexual assault, tabbed him as a suspect. The police also suspected Angelini because one of the investigating officers had spotted him late at night near the victim's apartment five days before the attack. The victim did not see her attacker but described his voice as deep and gravelly. She also told the police that she thought the attacker might have been black. Police then brought in Angelini, who is white, for questioning. The victim later identified Angelini's voice as that of her attacker.

Police investigators learned that nearly four months earlier the victim's apartment had been burglarized while she was sleeping. The victim had reported the burglary to the police, and days later told police that she had received harassing phone calls from an anonymous caller with a deep, gravelly voice. The caller told her that he had her purse and pairs of her panties. The victim found her panties on the antennas of cars at her place of employment a few days later. The victim's name and telephone number were handwritten on the panties. The police still had the panties in its possession and ar-

ranged for a handwriting expert to compare the writing on the panties with samples of Angelini's handwriting obtained in connection with his 1982 conviction. The expert's comparison was inconclusive, but after obtaining more recent samples, he concluded that it was Angelini's handwriting on the panties.

In August 1996 prosecutors filed an information charging Angelini with two counts of aggravated criminal sexual assault. Police arrested him in Eaton County, Michigan, one month later. The state trial court appointed counsel for Angelini in September 1996. In October 1996 Angelini asked to proceed pro se, but then withdrew the request. In December 1996 the court granted the state's motion to amend the information, increasing the number of counts to seven, including two additional counts of aggravated criminal sexual assault, two counts of criminal sexual assault, and one count of home invasion. The court also denied several defense motions, including motions *in limine* to prevent the state from using *modus operandi* evidence linking the 1982 and 1996 attacks and to suppress the victim's voice identification.

The trial commenced on December 16, 1996. The state called several witnesses, including the victim, investigating officers, the emergency room physician who examined the victim after the attack, the handwriting expert, and the 1982 assault victim. The state had no physical evidence or eyewitness testimony linking Angelini to the attack. On direct examination the victim testified that her initial statement to the police that the assailant might have been black was merely an impression at that time based upon the timbre of his voice. Defense counsel did not question the victim about this issue, nor did he mention her initial voice identification during his closing argument. The state elicited detailed testimony from the 1982 victim about her attack, in which Angelini broke into the victim's apartment, bound her hands, beat her, choked her, inserted his finger into her vagina, and anally raped her. The state argued to the jury that the two crimes had a similar *modus operandi,* suggesting that Angelini committed the second crime.

Defense counsel addressed the difficult circumstances surrounding the case during his closing argument. He acknowledged, through a long and descriptive narrative, the heinous nature of the 1982 crime and the courage exhibited by the victim of that attack. Counsel stressed to the jury that, although Angelini's actions in 1982 were "despicable," he was not on trial for that crime. Counsel repeatedly expressed sympathy and admiration for the victims of both crimes, and asked the jury to remain objective even though Angelini looked "guilty," "cold," "like he could care less" about the victims, and "like a rapist." Defense counsel's closing argument was unavailing—the jury found Angelini guilty of all charges.

Defense counsel moved for a new trial. On January 13, 1997, Angelini filed his own motion for a new trial and a "Motion for Leave to Withdraw Counsel." The court granted Angelini's motion to proceed without counsel over the state's objection, but denied his request for a new trial. The court then sentenced him to three consecutive terms of 60 years' incarceration.

Angelini appealed pro se to the Illinois appellate court, raising nine challenges to his convictions, including several claims that his counsel performed ineffectively. After the state filed a response, Angelini raised for the first time in reply that he did not voluntarily waive counsel. The court affirmed his convictions without addressing the waiver-of-counsel issue, and later denied his request for a rehearing.

The Illinois Supreme Court summarily denied his petition for leave to appeal.

In August 1999 Angelini petitioned for a writ of habeas corpus in federal district court. *See* 28 U.S.C. § 2254. His petition raised five grounds for relief including ineffective assistance of counsel and involuntary waiver of counsel. The state argued in its response that Angelini procedurally defaulted his waiver-of-counsel claim because he did not properly raise the issue on direct appeal. The district court denied Angelini's petition without reviewing the transcripts of his trial. In doing so, the court concluded that Angelini had not procedurally defaulted his waiver-of-counsel argument, but rejected that claim on its merits. Angelini filed a notice of appeal, which the court construed as a request for a certificate of appealability. In January 2001 the court granted Angelini's request and certified two issues for appeal: (1) whether he voluntarily waived counsel at sentencing, and (2) whether he received ineffective assistance of counsel.

■ The state renews its argument raised to the district court that Angelini procedurally defaulted his waiver-of-counsel claim. As we noted in *Spreitzer v. Schomig*, 219 F.3d 639, 646 (7th Cir.2000), Illinois Supreme Court Rule 341(e)(7) states that arguments presented in Illinois courts for the first time in a reply brief are waived. Angelini did not raise the waiver-of-counsel issue until his reply brief to the Illinois appellate court. Though Supreme Court Rule 341(g) allows an appellant to respond to questions raised in the appellee's answer, *see id.*, the state did not address the issue. Angelini never presented the claim later in a post-conviction petition and no longer can do so. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 844–45, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999) (holding that habeas petitioners may not resort to federal court without first giving the state

courts a fair opportunity to address their claims and to correct any error of constitutional magnitude); *Wilson v. Briley*, 243 F.3d 325, 327 (7th Cir.2001). Therefore, Angelini procedurally defaulted the issue because he did not present it to the state court.

■ We next consider Angelini's ineffective-assistance-of-counsel claim. Federal courts may grant habeas corpus relief only if the state courts's adjudication resulted in a decision that "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); *Washington v. Smith*, 219 F.3d 620, 627 (7th Cir.2000). An "unreasonable application" of federal law occurs when the state court identifies the correct governing legal rule but unreasonably applies it to the facts of the state prisoner's case. *Williams v. Taylor*, 529 U.S. 362, 407, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000); *Cossel v. Miller*, 229 F.3d 649, 654 (7th Cir.2000). Because we must defer to any reasonable state-court decision in applying the "unreasonable application" prong of § 2254(d)(1), *Ouska v. Cahill–Masching*, 246 F.3d 1036, 1044 (7th Cir.2001), we may not substitute our independent judgment as to the *correct* outcome, but may ask only whether the outcome was *unreasonable*. *Washington*, 219 F.3d at 628.

■ To prevail on an ineffective-assistance-of counsel-claim, Angelini must demonstrate that (1) his attorney's performance fell below an objective standard of reasonableness, and (2) the deficient performance caused him prejudice. *See Strickland v. Washington*, 466 U.S. 668, 687–88, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *Montenegro v. United States*, 248 F.3d 585, 590 (7th Cir.2001). Courts review counsel's performance under the first prong deferentially, presuming reasonable

judgment unless the factual record rebuts such a presumption. *See Strickland,* 466 U.S. at 689, 104 S.Ct. 2052; *Matheney v. Anderson,* 253 F.3d 1025, 1039 (7th Cir. 2001). With regard to the prejudice element, Angelini must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *See Strickland,* 466 U.S. at 689, 104 S.Ct. 2052; *Matheney,* 253 F.3d at 1039–40.

■ Angelini contends that his counsel was ineffective for two reasons: (1) he failed to stress the victim's initial voice identification that the perpetrator may have been black, and (2) he made several prejudicial comments during closing argument. The Illinois appellate court correctly identified *Strickland* as the source of the rule to determine whether counsel deprived Angelini of his Sixth Amendment right to effective assistance of counsel. The Illinois appellate court reasonably concluded that counsel's failure to exploit the victim's initial voice identification did not constitute ineffective assistance. The state addressed this issue during direct examination—the victim admitted to the discrepancy and explained that her initial statement that the victim may have been black was a mere impression. We agree that counsel had little to gain by challenging a sympathetic witness about her initial identification, and his failure to raise the issue during his closing is understandable because the victim later recognized Angelini's voice as the perpetrator. Therefore, defense counsel's actions did not constitute ineffective assistance of counsel.

Defense counsel's closing argument is more troubling. The district court concluded, without examining the trial transcripts, that the Illinois appellate court reasonably concluded that defense counsel's closing argument did not constitute ineffective assistance. In its opinion the Illinois appellate court implied that defense counsel's closing argument merely acknowledged Angelini's past crime:

> Despite counsel's efforts to have her testimony excluded, the victim of the 1982 deviate sexual assault, to which defendant pleaded guilty, testified at this trial. In his closing argument, counsel expressed sympathy and admiration for this woman. He emphasized the fact that defendant did not deny that he had committed the earlier attack and did not attempt to conceal his prior conviction. Rather, counsel argued that, notwithstanding his client's prior conduct, the State failed to prove his guilt of the current charges beyond a reasonable doubt.

*People v. Angelini,* 294 Ill.App.3d 1124, 242 Ill.Dec. 583, 721 N.E.2d 862 (1998). Though the Illinois appellate court's conclusions are entitled to considerable deference, the court may have understated the nature of defense counsel's closing argument. Defense counsel not only acknowledged the earlier crime and its victim, but repeatedly revisited the crime in descriptive detail:

> Now does he look like a convicted felon? Yes, he is and yes, he does. Does he look like a convicted rapist? Yes, he does because he is a convicted rapist from 14 years ago. Does he look cold? Does he look mean? Does he look like he could care less about me and you? Does he look like he could care less about [the 1982 victim]? Does he look like he could care less what [the 1996 victim] thinks of him? Yes, he does. Does he look guilty to you? Look guilty to you? My guess is that you're thinking yeah, yeah, he does. He looks mean and cold. He looks like a rapist. He looks like a predator. He looks exactly like everything Mr. Barnard [the prosecutor] just told you he was. But looking

like it doesn't get it. It has to be proven beyond a reasonable doubt that he violated [the 1996 victim] on May 20th of this year like they've charged him with.

What he did in 1982 to [the 1982 victim], like Mr. Barnard says in a different way, is absolutely despicable. . . .

. . . .

For the 1982 situation. . ., as far as Mr. Angelini being punished for that and serving his time, maybe you think that wasn't enough. Maybe you think that he should have been put to death for that. Maybe you think that he should spend the rest of his life in the penitentiary in solitary for that. Maybe you think that right now he should be taken out back of the courthouse and hung for the 1982 incident, and I appreciate that. That's probably what a lot of us think and maybe a lot of us are afraid to say it, and I understand that.

If we could talk about [the 1982 victim] for a few minutes. It is absolutely amazing to me, Mr. Barnard talked about her courage. She was unflappable, undeniable courage. How in the world, she was beaten so bad, I can't even say it, how it is, how it is she survived I don't know. How she was able to go back to work a week and a half later stuns me. I mean she could have been in the hospital for four days. She could have been, stayed off work for months and everybody would understand that. Everybody. And my submission to you is that the most emotional testimony this week came from her, and it came from her when she looked in the mirror and saw what she saw when her assailant left. My god, look at me. I can't even hardly see myself. Look at me. That's vivid to her because 14 years later she remembers it like that. Unfortunately, she will remember it the rest of her life and it will stay with her forever. . . .

. . . .

. . . Maybe you think this guy is guilty. He's the one. He's the one in 1996. He's cold, he is a fiend, he is a brute for doing what he did in 1982 and my god if he did this in 1982 they have the right guy. He's good for it. He did it, looks like him, sounds like him, smells like him, he did it. Period. Please don't jump to that conclusion no matter how emotional [the 1982 victim's] testimony was. And maybe you're not, you weren't physically in the same position I was in, maybe you picked it up, maybe you picked up the eye contact that [the 1982 victim] had not with but against Tony Angelini. Because even though she says she never saw him in terms of being able to identify him in late September of 1982, there's no doubt that's him because he eventually, she bit him, that was huge evidence, and he eventually pled guilty to that mainly because of that. I have never seen a stare like that in my life. I have never seen such exerted stare like that in my life. It would draw you cold if by chance you were in my shoes yesterday afternoon, and who could blame [the 1982 victim] for that stare.

. . . .

. . . [The 1982 victim] was beaten severely, severely. She was slapped repeatedly across the right side of her face not to mention the rest of her body that was considerably banged up. Her head was shoved, shoved, banged into the floor. It may have been banged into the wall, bathroom door. She was repeatedly beaten. She was beaten within an inch of her life. That's why I don't understand how she survived, how she could have possibly survived physically and emotionally. . . .

Defense counsel went beyond expressing sympathy for the victim of the 1982 crime—he repeatedly recounted the specific details of the crime and expressed contempt for his own client. Angelini argues that the strong words counsel used to describe him, the sustained focus on the 1982 crime, and the repeated expressions of sympathy for the victim violated the duty of loyalty he owed to Angelini and was tantamount to abandonment. This court has recognized that insufficient or improper closing argument by defense counsel may form the basis of a claim for ineffective assistance. *See Hall v. Washington,* 106 F.3d 742, 750 (7th Cir.1997); *Kubat v. Thieret,* 867 F.2d 351, 368 (7th Cir.1989).

The Illinois appellate court labeled the choice of words employed by defense counsel during closing argument as a "tactical decision" that was entitled to deference, and concluded that there was no reason to believe that he suffered prejudice. The fact that a lawyer's action is labeled a tactic, however, "does not immunize it from review in a challenge to the lawyer's effectiveness." *Miller v. Anderson,* 255 F.3d 455, 458 (7th Cir.2001); *see also Hall,* 106 F.3d at 750 (counsel's closing argument to the court cannot be considered a reasonable strategic choice given its total lack of focus on the defendant's individual character and its reliance on irrelevant religious claims).

■ In determining whether the Illinois appellate court reasonably concluded that defense counsel's actions did not constitute ineffective assistance, we must evaluate his conduct as a whole because mistakes at some points in the trial might be redeemed by wise tactics at some other points. *Miller,* 255 F.3d at 458–59. But this court, like the district court below, cannot effectively evaluate the reasonableness of counsel's conduct without the benefit of the trial transcripts. What did the state argue in its closing argument? Did the state focus heavily on the testimony of the 1982 victim? How effective was defense counsel throughout trial? How strong was the state's case?

These same concerns arise in our evaluation of prejudice under *Strickland's* second prong. If counsel erred in his closing argument, would Angelini have had more than a negligible chance of acquittal? *See id.* From our review of the Illinois appellate court's opinion, the evidence against Angelini was hardly overwhelming—the state relied primarily on circumstantial evidence. Without a record of what occurred during the trial, we are in no position to determine whether the Illinois appellate court reasonably concluded under *Strickland* that defense counsel performed adequately. Therefore, we must remand the case to the district court to determine, after a full review of the state-court record, *see* 28 U.S.C. § 2254(f), whether the Illinois appellate court reasonably concluded that defense counsel's closing argument did not constitute ineffective assistance of counsel, and if not, whether defense counsel violated the principles spelled out in *Strickland.*

The judgment of the district court is AFFIRMED in part, VACATED in part, and REMANDED for proceedings consistent with this order.